# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| | § | |
| **v.** | § | **Criminal No. 4:07CR263** |
| | § | **Judge David Hittner** |
| | § | |
| **WARREN TODD HOEFFNER,** | § | |
| **RACHEL ROSSOW, and** | § | |
| **JOHN PRESTSAGE** | § | |

## "SANCHEZ" PLAINTIFFS' MOTION FOR LIMITED DISCLOSURE OF GRAND JURY MATERIALS

TO THE HONORABLE JUDGE HITTNER:

COMES NOW, Jose Luis Sanchez, Alfredo Alpidio Aguilar, Luis Aguilar, Ramiro Aguilar, Benito Aguirre, Jr., Fernando Alaniz, Pablo Alaniz, Alfredo Aldapa, David Hillario Alvarado, Jose Hilario Alvarado, Jose Hilario Alvarado, Daniel Armadillo, Sr., Elias Armadillo, Jose Benito Armadillo, Dionicio Arredondo, Victor Arriola, Ramiro Baez, Juan R. Benavides, Rafael Flores, Benavides, Jr., David Bernal, Zacarias Caballero, Arnold Trevino Cadena, Norberto Cadena, Jr., Norberto Cadena, Sr., Anastacio Canales, Alejandro Cantu, Aurelio Cantu, Adan Cantu, Sr., Benito Leal Cantu, Jose Arturo Cantu, Jose Luis Cantu, Noe Cantu, Raul Cantu, Sr., Roberto C. Cantu, Ruben Costilla Cantu, Victor Cantu, Jamie Cardenas, Jose Santos Carrion, Roy P. Carrion, Jose Casiano Carrizales, Atanacio Hernandez Castillo, Luis C. Castillo, Adan Cavazos, Ramon Tamez Cedillo, Victor Cerda, Adolfo Chapa, Jr., Delfino V. Chapa, Lorenzo Chapa, Genaro Chavera, Pablo Chavera, David C. Chavera, Luis R. Constante, Ramon C. Corona, Jose Torres Coronado, Carlos Cruz, Leonel Curiel, Francisco Davila, Thomas W. Davis, Jose A. De La Rosa, Fernando Soliz DeLeon, Jose P. DeLeon, Jr., David Duenes, Jacinto

1

Espinoza, Sabas Rudy Espinoza, Santiago G. Espinoza, Richard G. Fabela, Antonio Felan, Benito Morgon Flores, Carlos Flores, Guadalupe Molina Flores, Rafael Flores, Abel l. Garcia, Alfredo Garcia, Jr., Fernando Garcia, Jr., Henri Garcia, Jose Noe Garcia, Lucio Garcia, Jr., Oscar Garcia, Alonzo Lonnie Garza, Jr., Armando Garza, Jr., Edwardo Ybarra Garza, Jr., Mauro M. Garza, Emilio Leal Garza, Armando Garza, Daniel Gomez, Norberto Gomez, Rafael Rodriguez Gomez, Ramon P. Gomez, Alejandro Gonzalez, Jr., Andres V. Gonzalez, Sr., Arnold Gonzalez, Arnulfo Gonzalez, Celestino Herrera Gonzalez, Daniel R. Gonzalez, Domingo R. Gonzalez, Guadalupe Gonzalez, Guadalupe Gonzalez, Jr., Jose A. Gonzalez, Vicente R. Gonzalez, RicardoGonzalez, Ruben Herrera Gonzalez, Abelardo Gonzalez, Eleno Guerra, Jr., Enrique Guerra, Jr., Jose Alonzo Guerra, Enrique Guerra, Sr., Manuel Guerra, Jr., Elizardo V. Gutierrez, Robert Guzman, George C. Hernandez, Herberto Landa Hernandez, Ismael Hernandez, Juan Jose Hernandez, Julian Saldana Hernandez, Fernando Herrera, Alberto Hinojosa, Alfredo Hinojosa, Apolonio Hinojosa, Casimiro Hinojosa, Claudio Hinojosa, Cleofus Hinojosa, Gabriel Hinojosa, Jr., Manuel Hinojosa, Jr., Reynaldo Hinojosa, Victoria Kemp, Cristobal Eloy Lazo, Pablo Lazo, Jr., Elias Leal, Francisco Cardona Leal, Librado Leal, Pedro Garcia Lerma, Reymundo G. Longoria, Benjamin Lopez, Carlos Lopez, Edward M. Lopez, Sr., Gilbert Lopez, Jose Lopez, Jose L. Lopez, Lucas Lopez, Andres Zuniga Luna, Isaias Luna, Modesto R. Luna, Adrian Maldonado, Benito N. Martinez, Benito Parras Martinez, Guillermo Martinez, Jesus Martinez, Jose Hector Martinez, Luiz Martinez, Marcelo Mata, Jr., Robert Mata, Sylvestre (Beto) Mata, Blas Medrano, Jr., Leopoldo Mendez, Jr., Domingo Garza Mendoza, Juan Gonzalez Mendoza, Jr., Ismael Jose Mesa,  Rumaldo Mesa, Francisco R. Molina, Jose Louis Mondragon, Juan P. Montalvo, Roberto Montalvo, Abelino Montoya, David Montoya Richard Morales, Arnulfo Moralez, Joe Moralez, Jr., Abelardo Frias Mota, Jose G. Mota, Jose A. Mungia, Sr., Abelardo

Frias Mota, Jose G. Mota, Jose A. Mungia, Sr., Eliseo Munoz, Jr., Felix U. Munoz, Jesus Munoz, Jr., Rodolfo Munoz, Jr., Roel Munoz, Jr., Secundio Munoz, Gary Edward Murphy, James William Murphy, Ruben Cuellar Narvaez, Hector A. Nunez, Adan A. Olivarez, Ricardo Olivo, Jr., Miguel R. Orona, Severo P. Ortiz, Jr., Jesus E. Parra, Alvara Garcia Pena, Fernando Cruz Pena, Jose H. Pena, Juan R. Pena, Sr., Ramiro Pena, Arturo Enrique Perez, Conrado Castillo Perez, Juan Pruneda, Jose Angel Quintanilla, Jr., Alvaro Ramirez, Ambrosio Nino Ramirez, Fred Ramirez, Hipolito Ramirez, Trinidad Ramirez, Rosendo Ramos, Manuel Recio, Jr., Salomon Resendez, Adan Reyes, Richard Reyes, Guillermo Reyna, Elias G. Rios, Esteban F. Rivera, Luis Rivera, Jr., Jose Robledo, Simon Robledo, Sr., Alfredo G. Rodriguez, Angel Ernesto Rodriguez, Manuel Rodriguez, Ray Edward Rodriguez, Rodolfo Romero, Sr., Gregorio Ruiz, Tomas Ruiz, Modesto M. Saavedra, Jr., Armando Saenz, Fidencio L. Saenz, Mauro Saenz, Felix Salinas, Elsa P. Sanchez, George H. Sanchez, Jose Luis Sanchez, Luis Felipe Sanchez, Richard Sanchez, Rito Sanchez, Roberto Sanchez, Jr., Heriberto Saucedo, Roberto D. Saucedo, Vernon John Schanen, Jr., Teodoro Sendejo, Richard Serna, Antanasio Arce Silvas, Juan Alfredo Silvas, Juan Vidal Soliz, Jose Soria, Rodolfo Soto, Silvestre Guadalupe Soto, Oscar Tobar, Sr., Rodolfo Torres, Sr., Cecilio Trejo, Jr., Cayetano R. Trevino, David Trevino, Ernestina Trevino, Guadalupe Trevino, Hector E. Trevino, Jose G. Trevino, Ramiro E. Trevino, Tomas Trevino, Jesus Valdez, Martin G. Valdez, Enrique Castro Vargas, Gregorio H. Vargas, Roberto Velasco, Juan R. Vera, Juan Jose Vera, Victor Vera, Jr., Lee Villa, Jr., Mario Villa, David D. Villagran, Tomas Villagran, Jr., Antonio R. Villareal, Baldemar R. Villarreal, Jr., Fidel Villarreal, Jr., Luis Villarreal, Manuel Villarreal, Oscar Villarreal, Reynaldo Villarreal, David Galvan Villela, Roland Worden, Ruperto Botello Ybarra, Jr., Ricardo Zamora, Amador Zapata, Cruz Zavala, Manuel Pineda Zavala (hereinafter referred to as "Plaintiffs"), and would show unto this

Honorable Court that there is a particularized need for disclosing Grand Jury transcripts in this matter.  Plaintiffs are litigants in state court proceedings against Hoeffner, Hoeffner & Bilek, LLP and The Hartford Financial Services Group, Inc. ("The Hartford").

## I.    SUMMARY OF MOTION

The conduct of The Hartford necessitates the disclosure of grand jury materials under Federal Rule of Criminal Procedure 6(e)(3)(E)(i).  Disclosure would avoid injustice in the state court civil litigation between Plaintiffs and The Hartford because the grand jury materials, it is believed, prove several elements of Plaintiffs' claims against The Hartford and negate at least one of The Hartford's affirmative defenses.  Moreover, because the grand jury has completed its activities, the need for disclosure outweighs any continuing need for secrecy.  Finally, Plaintiffs' request is narrowly tailored and structured so that disclosure is limited.

## II.    STANDARD TO RELEASE GRAND JURY TRANSCRIPTS

While the general rule is that grand jury proceedings are to be kept secret, transcripts may be disclosed "when so directed by a court preliminarily to or in connection with a judicial proceeding."  Fed. R. Crim.P. 6(e)(3)(C).  Because of the great need for secrecy in grand jury proceedings, any party seeking such disclosure must demonstrate a "particularized need" for the material that outweighs the policy of secrecy.  *Pittsburgh Plate Glass Co. v. United States,* 360 U.S. 395, 400, 79 S.Ct. 1237, 1241, 3 L.Ed.2d 1323 (1959).  Such a need requires the requesting party to establish that:  1) the material he seeks is needed to avoid a possible injustice in another judicial proceeding; 2) the need for disclosure is greater than the need for continued secrecy; and, 3) the request is structured to cover only material so needed.  *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211-22, 99 S.Ct. 1667, 1674, 60 L.Ed.2d 156 (1979); *Simpson v. Hines*, 729 F.Supp. 526, 527 (E.D.Tex. 1989).  Whether to release a grand jury transcript is purely a matter

of this court's discretion.  *Miramontez*, 995 F.2d at 59; *In re Grand Jury Testimony*, 832 F.2d 60, 62 (5th Cir.1987); *In re Corrugated Container Antitrust Litigation*, 687 F.2d 52, 55 (5th Cir. 1982). The burden placed on the party seeking disclosure is not static. "[A]s the considerations justifying secrecy become less relevant, a party asserting a need for grand jury transcripts will have a lesser burden in showing justification" for their release. *Douglas Oil*, 441 U.S. at 223, 99 S.Ct. at 1675. The reasons justifying secrecy of grand jury proceedings, as stated by the United States Supreme Court, are:

1)    to prevent escape of those whose indictment may be contemplated;

2)    to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors;

3)    to prevent subornation or perjury or tampering with the witnesses who may testify before [the] grand jury and later appear at the trial of those indicted by it;

4)    to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; and,

5).    to protect [the] innocent accused who is exonerated from the disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.

*Douglas Oil*, 441 U.S. at 219 n. 10, 99 S.Ct. at 1673 n. 10, 60 L.Ed.2d at 165 n. 10 (citing *United States v. Procter & Gamble*, 356 U.S. 677, 681-82 n. 6, 78 S.Ct. 983, 986 n. 6,2 LO.Ed.2d 1077 (1958)).

In this case, there is little, if any, need for the continued secrecy of the grand jury transcripts.  The Government indicted and obtained convictions.  Any statutes of limitations have expired on the Government's allegations; therefore, there is no chance of escape by a potential wrongdoer.  Since the prosecution is well over, there is no motive for any of the indicted defendants to importune the grand jurors.  In fact, Plaintiffs would request the grand jurors' names be redacted from the transcripts to alleviate any concerns about their privacy.  Likewise, all disclosures to the grand jury are complete, and thus remain untrammeled.

Finally, there is no need to protect the accused defendants from disclosure since one has already stood trial and the other two plead guilty and were sentenced by this Court.  Accordingly, not one of the Supreme Court's justifications for secrecy are applicable to this case at bar.

### III.   PARTICULARIZED NEED

Plaintiffs have sued The Hartford for negligence, gross negligence, aiding in fiduciary breaches, and tortious interference with contract.  The claims arise out of its employees' and senior officers' dealings with Plaintiffs' lawyers, including Hoeffner.  Prior to their suit, the United States instituted criminal prosecutions for conduct arising out of many of the same operative facts as the case at bar.

Specifically, on June 25, 2007, the United States indicted Warren Todd Hoeffner on the theory that he paid bribes and kickbacks to Rachel Rossow and John Prestage so they would falsely represent the settlement amounts were fair and reasonable.  In its June 27, 2007 press release, the Government stated, "[A] Houston attorney [...] paid bribes and kickbacks to former insurance company employees to recommend the settlement of silica-related claims….".

At trial, one of the first -- if not the first -- exhibit introduced as a business record of The Hartford was Government Exhibit 537.  *See Exhibit A attached hereto*.  The exhibit portrays the

Hoeffner settlements as inflated as a result of collusion and bribery.  During trial, the factual content in Exhibit 537 was proven false.  It is now the centerpiece of various lawsuits pending against The Hartford.   Eventually, the Government abandoned its "bribes and kickbacks" allegations against Hoeffner. *See United States v. Hoeffner* 626 F.3d 857, 866 n.4 (5th Cir. 2010).

At Hoeffner's trial, The Hartford employees directly linked to Exhibit 537 as authors, editors or recipients distanced themselves from the memo.  Assistant Vice-President Fred Zwick testified that he didn't recall reviewing it even though he was shown to be an editor of the memo. Deputy General Counsel Elizabeth Sacksteder testified that the memo was "never finalized" even though it was on the Government's exhibit list.  General Counsel Neal Wolin testified he was "not familiar with the [memo]" even though he was listed as the sole recipient.  In the Plaintiffs' lawsuit against The Hartford, the listed author of the memo recently testified:  "It's not the Pinkes memo, it's a draft memo prepared by John Kinney that I didn't prepare."  *See Andrew Pinkes deposition testimony attached as Exhibit B, pp. 21 – 22*.  Those witnesses associated with the Pinkes memo have disowned it, labeling it a mere "draft", despite the fact that it was the first Hartford document used by the Government at Hoeffner's trial.  In his recent deposition, even Mr. Pinkes admitted there is nothing in the memo that indicates it was, or is, a draft.  *See Id. at p.23*.

In the Plaintiffs' state court litigation, Hoeffner noticed Pinkes' deposition.  The Hartford filed a Motion to Quash stating: "There is no reason to believe that the memorandum played anything but a bit part – if that – in the decision to bring charges." *See Emergency Motion to Quash Subpoenas (Document 133, p. 16)*.  Almost 3 ½ years since the indictment, and more than a year after the Hoeffner trial, The Hartford filed an affidavit in a United States Bankruptcy Court in New York, stating:  "no witness [at the Hoeffner trial] testified that any of the actual

settlement payments were unreasonable or inflated as a result of the conduct of the former Hartford employees." *See p. 3 of Declaration of Mathew Scoff attached hereto as Exhibit C[1]*. The unmistakable conclusion is that the information in Government Exhibit 537 is the only information that existed which portrayed the settlement amounts as "inappropriate."

It is Plaintiffs' contention that senior management of The Hartford, by and through its General Counsel's office, manufactured a false bribery and kickback story in order to cover up one of its Senior Vice-president's involvement with the payments made by Hoeffner to Prestage and Rossow. The Hartford recently filed an Answer in Plaintiffs' civil case claiming among other things that "The Hartford is not liable for the criminal, unauthorized, or ultra vires conduct of its employees." While this may sometimes be a defense in a civil case, it is Plaintiffs' position that The Hartford cannot shield itself from civil liability by spinning one crime into a completely different crime. By manufacturing a false bribery or kickback scheme, The Hartford ratified the conduct of its employees. Also, The Hartford itself, through the acts of manufacturing Government Exhibit 537, is directly liable for the acts of its senior officers and executives. Accordingly, there is a particularized need to demonstrate the role that Government Exhibit 537 played. Plaintiffs need disclosure of the transcripts to demonstrate that senior officials from The Hartford represented and ratified the facts contained in Exhibit 537 to be true, accurate and reliable.

Not only is a particularized need for disclosure necessary for Plaintiffs to combat The Hartford's affirmative defense, disclosure is also needed to impeach the credibility of The Hartford. The Hartford has already represented to this Court that there is no reason to believe Exhibit 537 played a part in the indictment. Yet in another federal court, The Hartford

---

[1] While The Hartford takes a wholly inconsistent position in federal bankruptcy court; as shown below, The Hartford has no regard for the federal judiciary and the sacred oath.

represented that there was no evidence that the Plaintiffs settlements were inflated or unreasonable. Plaintiffs believe the only evidence that exists to support the Government's allegations that Hoeffner paid bribes and kickbacks to obtain inappropriate settlement amounts is based on Government Exhibit 537.

Consequently, disclosure is needed to impeach The Hartford and bring to light the true circumstances surrounding Exhibit 537. Plaintiffs strongly suspect that Exhibit 537 was represented as more than a draft and was not ostracized at the grand jury proceeding as it is now. The district court in *In Re Catfish Antitrust Litigation* released grand jury transcripts in a related civil matter. *See In Re Catfish Antitrust Litigation 164 F.R.D. 191, 195 (N.D. Miss 1995).* The Court found that witnesses' failures to recall, and inconsistent testimony, outweighed concerns regarding secrecy, particularly since the grand jury investigation had ended. The court narrowly tailored its order by restricting access to the transcripts to only the parties' respective counsel and prohibiting any public disclosure: "any remaining interests of secrecy [were] adequately protected in [the] case." Id.

### a.) *Documents Recently Produced for the First Time Confirm The Hartford's Efforts to Portray the Settlements as "corrupted" and "extraordinary."*

Just three weeks ago, The Hartford produced for the first time documents that clearly demonstrate that The Hartford, without supporting evidence, tailored Hoeffner's payments into a "kickback" scheme. Plaintiffs have just discovered that on April 19, 2004 The Hartford sent a criminal referral directly to the U.S. Attorney's office in the Western District of Texas.[2] The referring memo starts by stating: "It's a cut and paste attempt to explain a situation that plays out like the 'King of Torts' and 'Fatal Attraction'." *See April 19, 2004 memo submitted under seal as Exhibit D.*

---

[2] It is believed that John Jacewicz, the lead investigator from The Hartford, sent the referral to the Department of Justice's Bud Paulissen because of a then-existing close relationship between the two.

The memo concludes:  "Bud, I hope this is of some help in understanding some of what we have. If there is **corruption** on the $35.3M settlement [Hoeffner's global settlement], this is a very substantial case." *Id. at p.11.*

Exactly four days after this referral memo, The Hartford "corrupted" the Hoeffner settlements by generating the Pinkes memo at issue.  The memo purported to state facts that would support the conclusion that the settlements at issue were inflated as a result of bribes or kickbacks paid by Hoeffner to Rossow and Prestage.   But such facts in the memo were misleading or false.  *See Hoeffner's Motion to Dismiss for Prosecutorial Misconduct (Document 108, pp. 54 - 75).* Not only did Exhibit 537 cast the Hoeffner settlements as corrupted, The Hartford purged all of the defense counsel evaluations related to the indicted settlements.[3]

The fact that the next document addressed was just recently produced for the first time is extremely shocking. On March 4, 2006 the lead investigator for The Hartford, John Jacewicz, wrote to the special agents for the U.S. Treasury Department and provided them with the very exculpatory facts that the Government attempted to exclude from the criminal case. Mr. John Jacewicz told the government the following:

- "…I believe David Cain is an active participant [of this scheme]."

- "Cain admitted that he knew of the kickbacks in the summer of 2003, that the amounts of the kickbacks were "substantial" and that what Rossow and Prestage were doing was improper and criminal."

---

[3] On April 28, 2008, AUSA John Braddock admitted to this Court that the government had not seen the defense counsel evaluations as of that date. Later, AUSA Quincy Ollison stated in open court that the government first received the evaluations in May 2008, confirming that Deputy General Counsel Elizabeth Sacksteder of The Hartford misrepresented their previous production. *See hearing transcripts attached as Exhibits E and F.*

- "Only after the kickback check to Prestage was discovered, and a full investigation initiated, did Cain come forward with his somewhat self-serving information."

- "…Cain had no other choice but to come forward and try to spin a tale that minimized his involvement."

- "Cain knew of the criminal activity at the time it was occurring and even knew of the concocted "cover story" that was to be utilized if the scheme was ever exposed but never reported it to anyone."

- "Knowing precisely how Rossow acquired her new found wealth, a truly innocent man (and attorney) would put as much distance as was humanly possible between he and her. That is not the case."

*See March 4, 2006 letter submitted under seal as Exhibit G.*  Importantly, the memo stated that because of "[Cain's] position of authority, [he] directly enabled Rossow to make the **extraordinary** settlements that generated the kickbacks."

Thus, it appears that because the settlements were being portrayed as "corrupted" and "extraordinary" by The Hartford, the government was focused on the "substantial [bribery or kickback] case" desired by The Hartford since the inception of the April 19, 2004 referral.  The importance of The Hartford's conduct, and the discovery of the grand jury testimony in this case, is manifest in the Fifth Circuit opinion:

> Based on the government's attempts to redact the words "bribes and kickbacks" from the indictment, its failure to present any evidence that the payments were bribes, and its failure to argue that the payments were bribes, we find that the government's abandonment decided, at most, that the payments Hoeffner made to Rossow and Prestage cannot be characterized as bribes or kickbacks.

*See United States v. Hoeffner, at 868.*

*b.)*      ***The Hartford has no regard for the Federal Judiciary or the Sacred Oath.***

When in its interest, The Hartford sponsors false testimony and evidence to federal tribunals.  One such occasion arose in the bankruptcy of its insured, Pulmosan Safety.

In that matter, and almost one year after the Hoeffner criminal trial in this Court, Hartford Vice President Matthew Scott filed the sworn declaration attached hereto as Exhibit C. The declaration concluded the opposite of the "information" The Hartford provided in the criminal case:  that there was no evidence "that any of the actual settlement payments were unreasonable or inflated as a result of the former Hartford employees." *See p.3 of Exhibit C*. While the Government eventually agreed with such conclusion in abandoning the bribes and kickbacks theory, a simple review of Mr. Scott's sworn deposition testimony in the Plaintiffs' state court suit demonstrates the numerous counts of perjury and bankruptcy fraud made in reaching this conclusion.

**Deposition Testimony**                                    **Sworn Bankruptcy**
                                                            **Declaration**

| P.4 – 13 to P.5 – 1 | |
|---|---|
| **BY MR. FLOOD:** <br> **13 Q: Good morning** <br> **14 A Good morning.** <br> **15 Q: Can you tell us your name, please?** <br> **16 A: Matthew Scott** <br> **17 Q: What do you do for a living, Mr. Scott?** <br> **18 A: I am vice president at The Hartford** <br> **19 Q: How long have you been vice president at The** <br> **2- Hartford?** <br> **21 A: I believe, about six years.** <br> **22 Q: It's 2012. So you became a VP at around 2006?** <br> **23 A: I believe so.** <br> **24 Q: What was your position before that?** <br> **25 A: I was a claim manager in claims and legal** <br> **Page 5** <br> **1 management services** | |

| | |
|---|---|
| **P.9 – 4 to P.9 – 25** | |
| **4 Q: In the course of your work at The Hartford, you** <br> **5 have been familiar with an insured called Pulmosan Safety** <br> **6 Equipment Corporation, correct?** <br> **7 A: No.** <br> **8 Q: You are not familiar with that insured?** <br> **9 A: No.** <br> **10 Q: Have you ever heard of it?** <br> **11 A: Yes.** <br> **12 Q: And so, you have heard of it, but you are not** <br> **13 familiar with it?** <br> **14 A: Correct.** <br> **15 Q: I guess I've got to figure out what you mean by** <br> **16 "familiar", then.** <br> **17 A: The name rings a bell, as far as hearing that name** <br> **18 in the past, but that's about as far as my recollection** <br> **19 goes.** <br> **20 Q: Are you the vice president of Heritage Holdings,** <br> **21 Inc.?** <br> **22 A: No.** <br> **23 Q: Is there a Matthew Scott, that works at The** <br> **24 Hartford, that is not you?** <br> **25 A: I don't believe so** | **¶ 2: Pulmosan was a corporation, organized under the laws of the State of New York, engaged in the manufacture and sale of industrial safety equipment. Numerous individuals who alleged that they used such equipment have asserted claims against Pulmosan and other entities, generally alleging that the equipment did not provide adequate protection and that as a result they were injured by exposure to asbestos, silica and/or mixed dust ("Underlying Claims").** <br><br> **¶3: On August 1, 1986, Pulmosan filed a certificate of dissolution under Article 10 of New York's Business Corporation Law. Since 1986, Pulmosan has remained in wind-up in accordance with the laws of the State of new York, New York. In the years following its dissolution, thousands of other individuals have asserted Underlying Claims against Pulmosan.** <br><br> **¶ 1: I am Vice President of Heritage Inc., which is a subsidiary of The Hartford Financial Services Group, Inc.** |
| **P.11 – 1 to P.11 – 9** | |
| **1 Q Are you familiar with a bankruptcy filing by the** <br> **2 company Pulmosan Safety Equipment Corporation?** <br> **3 A: No.** <br> **4 Q: You have no knowledge of that bankruptcy** <br> **5 whatsoever?** <br> **6 A: No.** <br> **7 Q: It is a true statement of fact that you have no** <br> **8 personal knowledge of any facts related to** | **¶ 1: I submit this declaration in connection with the Chapter 7 bankruptcy case of Pulmosan Safety Equipment Corporation ("Pulmosan" or the "Debtor").** |

| | |
|---|---|
| that bankruptcy?<br>9 A: That's true. | |
| **P.11 – 21 to P.11 – 23** | |
| 21 Q Mr. Scott, I'm going to hand you a document marked<br>22 as PTX 39. You can take a look at that. This is a<br>23 six-paged document, PTX 39. | |
| **P.14 – 2 to P.15 – 24** | |
| 2 Q This Declaration was not prepared by you, was it?<br>3 A: No.<br>4 Q: Was it signed by you?<br>5 A: I believe it was. I don't know whether it was<br>6 signed by me or not.<br>7 Q: Was this Declaration made, by you, in connection<br>8 with that bankruptcy?<br>9 A: I believe this Declaration was prepared in<br>10 conjunction with counsel and in connection with the matter<br>11 in which it was filed.<br>12 Q: The beginning of this Declaration states, "Matthew<br>13 Scott hereby declares, under penalty of perjury, as<br>14 follows"; did you or did you not make this declaration?<br>15 A: I believe I did.<br>16 Q: Did you make it under penalty of perjury?<br>17 A: Yes.<br>18 Q: It's your testimony you have never worked with any<br>19 lawyers at Wilmer Cutler Pickering Hale and Dorr, correct?<br>20 A: Not that I recall.<br>21 Q: And it's also your testimony that, though you have<br>22 heard of Steptoe and Johnson, you don't recall working with<br>23 anybody at that firm? | The Declaration begins with:<br><br>**Wilmer Cutler Pickering Hale & Dorr, LLP**<br>**Craig Goldblatt (CG 6793)**<br>**Nancy L. Manzer (NM 6569)**<br>**1875 Pennsylvania Ave. NW**<br>**Washington, DC 2006**<br>**Tel: (202) 663-6000**<br>**Fax: (202) 663-6363**<br><br>**Steptoe & Johnston, LLP**<br>**James E. Rocap III**<br>**1330 Connecticut Ave. NW**<br>**Washington, DC 20036**<br>**Tel: (202) 429-8152**<br>**Fax: (202) 429-3902**<br><br>***Attorneys for First State Insurance Company and New England Reinsurance Corporation*** |

| | |
|---|---|
| **24 A: Correct.** | |
| **P.16 – 10 to P.16 – 24** <br> **10 Q: Do you have any personal knowledge regarding the** <br> **11 differences between an original and subsequent superseding** <br> **12 indictments against those individuals?** <br> **13 A: No.** <br> **14 Q: Do you have any knowledge whatsoever about the** <br> **15 evidence that was admitted at a trial in the United States** <br> **16 versus Plaintiffs?** <br> **17 A: No.** <br> **18 Q: You've made no attempt to review that evidence and** <br> **19 understand what is said and what was said at trial?** <br> **20 A: No, I have not.** <br> **21 Q: The Declaration states, at the end, that you** <br> **22 declare, under penalty of perjury, that the foregoing is true** <br> **23 and correct to the best of your knowledge, correct?** <br> **24 A: Correct.** <br> **25 Q: But you do not have any information regarding what** <br> **Page 18** <br> **1 the evidence was, admitted at the September 2009 trial in** <br> **2 the United States versus Plaintiffs; that is true, isn't it?** <br> **3 A: I have no recollection of that** <br> **4 Q: I'm sorry?** <br> **5 A: I have no recollection of understanding that** <br> **6 evidence or what that evidence was.** <br> **7 Q: And you don't have any recollection whatsoever of** <br> **8 ever reviewing that evidence" That's what you've already** <br> **9 testified to.** <br> **10 A: As I sit here today, I do not recall.** <br> **11 Q: Can you and I agree that that's** | **¶ 6: Certain claimants in the Underlying Claims have asserted that First State may be obligated to pay on behalf of Pulmosan amounts for the Underlying Claims in excess of the Aggregate Limit. Those claimants assert that two former Hartford employees engaged in improper conduct in connection with the settlement of silica claims in which the claimants were represented by a plaintiffs' attorney in Texas ("Plaintiffs"). These two employees entered guilty pleas in February 2010 to Count One of the Second Superseding Indictment in <u>United States v. Plaintiffs, et al.</u>, No. H-07-263 (S.D. Tex.). Count One alleges that the employees conspired with Plaintiffs to defraud Hartford by misrepresenting and concealing certain facts regarding their conduct and involvement in the settlement of certain bodily injury claims arising out of exposure to silica, including but not limited to their acceptance of payments from Plaintiffs.** <br><br> **¶ 7: In approximately September 2009, prior to the entry of the former employees' please, a jury trial was held with respect to related charges against Plaintiffs. During the trial, no witness testified that any of the actual settlement payments were unreasonable or inflated as a result of the conduct of the former Hartford employees.  The Plaintiffs trial ended in a mistrial (the jury could not reach a unanimous resolution). The charges against Plaintiffs in the subsequently-filed Second Superseding Indictment, including the Count to which the former Hartford employees pleaded guilty, are currently subject to an appeal of a denial of a motion to dismiss. The appeal is pending before the** |

| something that 12 would have been out of the ordinary, for you to review trial 13 testimony from a criminal proceeding in a federal court in 14 Texas? 15 A: Yes. 16 Q: And this Declaration was prepared in November of 17 2010, correct? 18 A: Correct. 19 Q: Approximately one year after the trial? 20 A: I don't know 21 Q: Because you don't know when the trial was? 22 A: I don't recall. | United States Court of Appeals for the Fifth Circuit. The two former employees, whose plea agreements are conditioned on the outcome of this appeal, are awaiting sentencing. |
|---|---|
| **P.19 – 17 to P.19 – 21** | |
| 17 Q Um, have you ever been involved in any attempt to 18 determine whether or not there was an improper erosion of 19 any insurance policy issued by any Hartford subsidiary to 20 Pulmosan? 21 A: I don't recall, specifically. | ¶ 12: In light of the imminent exhaustion of the Policies, the assertions of improper exhaustion, Mr. Weiss's additional insured claims, and the numerous pending Underlying Claims, First State concluded that the most orderly forum for resolving any remaining disputes with respect to available coverage, and for the distribution of insurance proceeds to those creditors asserting claims against Pulmosan, would be a chapter 7 bankruptcy. |
| **P.20 – 16 to P.21 – 10** | |
| 16 Q It is also true, is it not, that you were not 17 involved in any investigation into whether or not payments 18 made to Rossow and Prestige resulted in their recommendation 19 of inappropriate settlement amounts? 20 A: I have no involvement in that, whatsoever. 21 Q: Have you ever reviewed internal Hartford 22 documentation regarding the authorization of settlement 23 payments to Mr. Plaintiffs and his clients by First State of | ¶ 9: Accordingly, First State believes that all payments it has made to settle claims against Pulmosan validly erode the Aggregate Limit in the Policies. |

| | |
|---|---|
| 24 any other Hartford subsidiary?<br>25 A: No.<br>Page 21<br>1 Q: Do you have any personal knowledge of when<br>2 payments were made by First State to Mr. Hoeffner and his<br>3 clients under any settlement agreement between Pulmosan,<br>4 Hartford, any Hartford insureds and Mr. Plaintiffs?<br>5 A: I don't recall.<br>6 Q: Are you familiar with whether or not The Hartford<br>7 or Pulmosan has received releases from Mr. Plaintiffs's<br>8 clients in exchange for settlement dollars paid by First<br>9 State?<br>10 A: I don't have any recollection of that | ¶ 8: Pulmosan has received, in return, full releases from all such claimants. |
| **P.21 – 17 to P. 21 – 19** | |
| 17 Q And it's true that you've never reviewed any of<br>18 those releases, true?<br>19 A: That is true. | ¶ 9: The admitted conduct of its two former employers, while victimizing Hartford, did not harm Pulmosan, which has received full, traditional, bargained-for claim releases form the claimants in return for First State's claim payments on behalf of Pulmosan. |
| **P.21 – 20 to P.22 – 5** | |
| 20 Q What I'd like to do is pick your brain a little<br>21 bit to see if you can help me out in understanding who it is<br>22 that might have prepared this Declaration for you. The<br>23 first page lists Craig Goldblatt and Nancy Manzer at Wilmer<br>24 Cutler Pickering Hale and Dorr in Washington, D.C. And<br>25 then, it also references a gentleman named James if I'm<br>Page 22<br>1 pronouncing this correctly Rocap at Steptoe & Johnson<br>2 Looking at those names, can you help me out, | |

| | |
|---|---|
| who you think<br>3 might have been responsible for inputting the actual<br>4 substance contained within this Declaration?<br>5 A: I don't know. | |
| **P.23 – 6 to P.24 – 18** | |
| 6 Q Um, what I'd like you to do is turn to page 3 of<br>7 your Declaration.<br>8 A: Okay.<br>9 Q: And at the bottom of the page, under paragraph 7<br>10 there is a sentence that starts, "During the trial"; do you<br>11 see that?<br>12 A: Yes.<br>13 Q: This is a reference to the September 2009 trial on<br>14 related charges against Mr. Plaintiffs; you see that?<br>15 A: Yes.<br>16 Q: If you would read that sentence out loud for me,<br>17 please. "During the trial."<br>18 A: "During the trial, no witness testified that any<br>19 of the actual settlement payments were unreasonable or<br>20 inflated as a result of the conduct of the former Hartford<br>21 employees."<br>22 Q: That sentence is a true statement, correct?<br>23 A: Yes, I believe it to be.<br>24 Q: That statement is not limited to any particular<br>25 settlement payments, correct? It uses the word "any."<br>Page 24<br>1 A: Yes, I agree.<br>2 Q: The payments that are being referenced there are<br>3 the payments by The Hartford to Mr. Plaintiffs and his | Scott makes such sworn statements despite having no knowledge of the subject settlements. |

18

| | |
|---|---|
| 4 clients, correct?<br>5 A: I believe that to be the case, yes.<br>6 Q: And in reviewing materials to prepare yourself for<br>7 this Declaration, you never saw a single document or a piece<br>8 of evidence nor received any suggestion from anybody that<br>9 there was any evidence that the actual settlement payments<br>10 by The Hartford to Mr. Plaintiffs or his clients were either<br>11 unreasonable or inflated, correct?<br>12 A: Correct. Not as far as I can recall.<br>13 Q: And they weren't unreasonable. And I didn't mean<br>14 to not qualify that. You never saw any of that, such<br>15 evidence, and never heard any suggestion that they were<br>16 unreasonable or inflated as a result of the conduct of the<br>17 former Hartford employees, true?<br>18 A: That's my recollection. | |

In the state court civil matters, The Hartford also defensively pleads that it "has not engaged in conduct warranting punitive damages." Plaintiffs have a particularized need for disclosure of the grand jury transcripts to demonstrate the malice and unconscionable conduct of The Hartford in falsely characterizing the Hoeffner payments as bribes and kickbacks in order to cover up the extortionate acts of its senior vice president.

## IV.   NARROWLY TAILORED DISCLOSURES

Plaintiffs request that any information related to the grand jurors' identities be redacted. In addition, as was done in the *In Re Catfish Antitrust Litigation*, Plaintiffs request an Order from the Court allowing release of the transcripts only to the attorneys of record in the underlying civil

matter and a restriction against further publication of the transcripts, except at any trial after their appropriate use has been established.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request disclosure of the grand jury proceedings in this matter pursuant to the restrictions addressed in this Motion.

Respectfully Submitted,

**HILLIARD MUNOZ GONZALES LLP**

s/ Robert C. Hilliard

By:_____
 Robert C. Hilliard
 State Bar No. 09677700
 Rudy Gonzales, Jr.
 State Bar No. 08121700
 Catherine D. Tobin
 State Bar No. 24013642
 Justin Williams
 State Bar No. 21555800
 John B. Martinez
 State Bar No. 24010212
 Marion M. Reilly
 State Bar No. 24079195
 Chris Pinedo, *Of Counsel*
 State Bar No. 00788935
 Mariana Garza
 State Bar No. 24075470

 719 S. Shoreline Boulevard,
 Suite 500
 Corpus Christi, TX  78401
 Telephone No.:  (361) 882-1612
 **Facsimile No.:    (361) 882-3015**

 **ATTORNEYS FOR PLAINTIFFS**

**<u>Certificate of Conference</u>**

Counsel for Plaintiffs have personally attempted to contact the counsel for Defendants to resolve the matters presented to the Court in this Motion and despite best efforts, counsel have not been able to resolve those matters presented.

Counsel for the U.S. Attorney's Office has no objection to the filing of this Motion.

Counsel for Intervenors' agree to the filing of this Motion.

Counsel for Hartford has no position to the filing of this Motion.

s/ Robert C. Hilliard
_____
Robert C. Hilliard

## Certificate of Service

The undersigned certifies that on August 27, 2012, the foregoing document was filed electronically with the court. This document was automatically served on all attorneys of record who have registered as electronic filing users and/or otherwise by certified mail, return receipt requested, on those lawyers involved in the *Sanchez* case, as listed below:

s/ Robert C. Hilliard

_____
Robert C. Hilliard

*Via Facsimile: 214-999-7713 and*
*CM/RRR 70112970000223380322*
Ms. Vanessa Griffith
VINSON & ELKINS, L.L.P.
2001 Ross Avenue,
Suite 3700
Dallas, TX 75201-2975
and
*Via Facsimile: (713) 615-5528 and*
*CM/RRR 70112970000223380339*
Robert M. Schick
VINSON & ELKINS, L.L.P.
1001 Fannin Street, Suite 2300
Houston, Texas 77002-6760
**Attorney for Defendant-**
**Hartford Insurance Company**

*Via Facsimile: 361-654-8879 and*
*CM/RRR 70112970000223380346*
Mr. John Flood
FLOOD & FLOOD
802 N. Carancahua
Suite 900
Corpus Christi, TX 78470

*Via CM/RRR 70112970000223380377*
Mr. Chris Flood
FLOOD & FLOOD
914 Preston at Main, Suite 800
Houston, Texas 77002

*Via Facsimile: 713-284-5250*
*and CM/RRR 70112970000223380391*
Lance Lubel
Lubel Voyles, L.L.P.
5020 Montrose, Suite 800
Houston, Texas 77006
**Attorney for Defendant-Todd Hoeffner**

*Via Facsimile: 361-866-8039 and*
*CM/RRR 70112970000223380353*
Mr. Darrell Barger
Mr. Tom Hermansen
HARTLINE, DACUS, BARGER,
   DREYER & KERN, LLP
One Shoreline Plaza
800 N. Shoreline Blvd
Suite 2000 – North Tower
Corpus Christi, TX 78401
**Attorney for Defendants**
**Hoeffner & Bilek, LLP**

*Via Facsimile: 361-575-0986 and*
*CM/RRR 70112970000223380360*
Mr. William L. Sciba, III
COLE , COLE & EASLEY, P.C.
302 W. Forrest
P. O. Drawer 510
Victoria, Texas 77902-0510
**Attorney for Intervenors**

*Via CM/RRR 70112970000223380384*
Mr. John Braddock
U.S. Attorney's Office
Southern District of Texas
515 Rusk Street
Houston, TX 77002-2600